UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

**GLORIA G. HERNANDEZ,**

    **Plaintiff,**

**V.**                                                   **Case No:  2:11-CV-617-FtM-SPC**

**COMMISSIONER OF SOCIAL
SECURITY**

    **Defendant.**

_____/

## ORDER

This matter comes before the Court on Plaintiff, Gloria G. Hernandez' Complaint seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's claim for disability insurance (Doc. #1) filed on October 27, 2011.  The Plaintiff filed his Brief in Support of the Complaint (Doc. #20) on April 2, 2012.  The Commissioner filed a Memorandum in Support of the Commissioner's Decision (Doc. #21) on May 4, 2012.  Thus, the issue is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

## FACTS

### *Procedural History*

The Claimant filed an application for a period of disability and disability insurance benefits on October 17, 2007. (Tr. 15). The claim was denied initially on February 8, 2008, and upon reconsideration on May 21, 2008.  (Tr. 15).  The Claimant filed a written request for

hearing on June 2, 2008. (Tr. 15). On December 3, 2009, a hearing was held before the Honorable Denise Pasvantis, Administrative Law Judge ("ALJ"). (Tr. 15). The ALJ issued an unfavorable decision on January 29, 2010. (Tr. 23). The Claimant filed a Request for Review on April 2, 2010. (Tr. 9). The Appeals Council denied the Claimant's Request for Review. (Tr. 1-3). Therefore, the decision of the Commissioner became final. Having exhausted all administrative remedies, the Claimant timely filed a Complaint with this Court. (Doc. #1).

*Plaintiff's History*

The Claimant was born on May 29, 1962, making the Claimant forty-five (45) years of age on the alleged disability onset date. The Claimant alleges an onset disability date of October 25, 2007. (Tr. 15). In addition, the Claimant has a ninth-grade education level and is able to communicate in English. (Tr. 33). The Claimant has past relevant work experience as a crew leader and bus driver. (Tr. 145; 147). The Claimant alleges disabilities due to a back injury, spasms, and hypertension. (Tr. 73).

*Medical and Psychological History*

The actual medical records in this case do not start until December 6, 2006. (Tr. 221). However, an Independent Medical Examination performed on June 22, 2007, by Dr. Keith J. Simon reviews various medical treatments that the Claimant had previous to December 6, 2006. (Tr. 197-203). Dr. Simon states that the Claimant had epidural steroid injections on June 8, 2006 with a Dr. Reed; the injections did not help and she apparently developed a CSF fluid leak and headaches. (Tr. 197). Dr. Simon reviewed records from a Dr. John White from March 26, 2007. (Tr. 198). The Claimant was to have an appointment that day for a stimulator and evaluation by Dr. Fry, a local pain management physician. (Tr. 198).

However, the Claimant did not show for the appointment and Dr. White placed the Claimant at maximum medical improvement with regard to her worker's compensation case and gave her no impairment rating. (Tr. 200). Dr. Simon also reviewed a functional capacity evaluation from Heartland Therapy Provider Network, indicating that the Claimant was at sedentary work, able to exert up to 10 pounds, with sitting most of the time and occasional walking and standing. (Tr. 201). The evaluation indicated the Claimant was able to perform in the minimum sedentary physical demand category. (Tr. 201). Testing indicated she gave full effort. (Tr. 201).

Dr. Simon reviewed records from DeSoto Memorial Hospital from January 14, 2007, which contained X-rays of the Claimant's left hip, back and coccyx. (Tr. 201). The hip and coccyx X-rays were normal but the back X-ray done on February 28, 2007, showed minimal degenerative changes involving the lower spine, particularly at L5-S1. (Tr.201).

Dr. Simon reviewed notes from a Dr. Ken Levy of Advanced Orthopedic Center from December 11, 2006. (Tr. 202). Dr. Levy indicated that a lumbar MRI did not show any surgical lesion and he recommended weight loss and a work hardening program. (Tr. 202). Dr. Levy diagnosed lumbar radiculopathy and facet joint disease. (Tr. 202). In addition, Dr. Levy's notes indicated that there was no herniation. (Tr. 202).

Dr. Simon also did his own medical examination of the Claimant. (Tr. 199). He stated that examination of her back revealed a very tight and prominent muscle spasm on the right; however, she could forward flex and almost touch the floor without bending her knees. (Tr. 199). She had decreased sensation in her right leg, but she had good patellar and Achilles reflexes. (Tr. 199). Her left lower extremity had decreased sensation in the foot. (Tr. 200). The right knee had marked retropatellar crepitance, but she still had full range of motion. (Tr. 200).

Dr. Simon diagnosed severe low back sprain/strain with muscle spasm and decreased range of motion; right lower extremity sensory neuropathy, which could be related to a neuropraxia from her injury; right patellofemoral pain syndrome; and normal left knee. (Tr. 202). He recommended bone scan and nerve conduction studies; physical therapy; and sedentary to light duty with varying sitting with standing, no repetitive bending and lifting, and no kneeling, stooping or stairs. He stated that she was still extremely symptomatic and had not reached maximum medical improvement. (Tr. 203).

Meanwhile, the records that are in the file indicate that the Claimant was seen at Community Care Family Clinic on December 6, 2006, by Dr. Michael Kryzkowski. (Tr. 221). The Claimant apparently wanted to discuss with Dr. Kryzkowski a consultation that she had had with Dr. Levy, who wanted the Claimant to have physical therapy as part of her worker's compensation case. (Tr. 221). Dr. Kryzkowski tried to convince her to follow Dr. Levy's advice and not follow that of non-surgeons. (Tr. 221). Dr. Kryzkowski saw the Claimant again on December 13, 2006, complaining of back pain and needed her blood pressure medication filled. (Tr. 219). The Claimant was upset about her appointment with Dr. Levy who told her she needed to lose weight and her back would feel better. She complained of severe pain radiating down both legs and numbness and tingling. (Tr. 219). She complained that her knees grinded, but would not give out on her. (Tr. 219). The Claimant did come in utilizing a cane. (Tr. 219).

Dr. Kryzkowski reviewed her MRI and indicated that it showed mild degenerative disease in her lumbar-sacral area. (Tr. 219). Dr. Kryzkowski advised her that he could not treat her for her worker's compensation problems; he renewed her blood pressure medications. (Tr. 219). Dr. Kryzkowski saw the Claimant again on January 19, 2007, and noted that she had been

injured in February of 2006, and had been seen by his office on numerous occasions but had been followed by Dr. Levy of orthopedics for the worker's compensation injury. (Tr. 217).

She had been to the emergency room a few days previously for back and knee pain. X-rays were benign and the back x-ray revealed mild degenerative changes. (Tr. 217). Examination of both knees revealed bilateral patellafemoral crepitus on range of motion. He diagnosed chronic back and knee pain with underlying patella femoral arthralgia. (Tr. 217). The Claimant was very emotional about the pain, so Dr. Kryzkowski gave her a test for depression, but it was not positive. Nevertheless, he discussed the emotional aspects of her illness. She was most upset that she had difficulty keeping up her home. He advised her to keep her upcoming appointment with Dr. Levy. (Tr. 217).

Dr. Kryzkowski's PAC saw the Claimant on February 23, 2007. The Claimant had an argument with Dr. Levy on January 29, 2007, and stated that she was not going back to him. (Tr. 215). The Claimant was assessed with back pain and given Ultram and Gabapentine. (Tr. 215). In addition, the Claimant indicated that she would like to get pregnant in November. (Tr. 215). On March 21, 2007, the Claimant saw Dr. Kryzkowski again for chronic back pain. (Tr. 213). The Claimant stated that she had seen a Dr. John White two weeks earlier for her worker's compensation case. Dr. White had given her a TENS Unit, which had not helped. (Tr. 213). Dr. Kryzkowski told her that he was not going to get involved with her worker's compensation dispute and recommended that she go back to the orthopedist; however, he did prescribe her pain medication, which he stated was for the last time. (Tr. 213).

On April 2, 2007, Dr. Kryzkowski again stated that he could not treat her for her worker's compensation problems and he would not give her any medication; however, she was welcome to come back with her other medical problems. (Tr. 211). On October 10, 2007, the

5

Claimant was seen again for her chronic pain syndrome and Dr. Kryzkowski gave her a prescription for Lortab until she could see a pain specialist. (Tr. 209). He also placed a consult for Mental Health to help her deal with her chronic pain. (Tr. 209). During this same time period, the Claimant was being seen at DeSoto Memorial Hospital. (Tr. 252-309). On April 4, 2007, she went to the emergency room complaining of low back pain. (Tr. 261). She was diagnosed with chronic back pain and given a prescription for Lortab, but the records indicate that the Claimant moved all four extremities well. (Tr. 261-62). She was seen again on April 15, 2007, and April 27, 2007, for the same problems. (Tr. 265). On May 12, 2007, she presented to the emergency room complaining of bilateral knee pain. (Tr. 274). X-rays were negative for any acute finding or any significant osteoarthritis or degenerative changes. (Tr. 274).

On June 8, 2007, she was seen at the emergency room for back pain. She indicated that the Hydrocodone which she had been given at the Center for Family Health did not help. (Tr. 279). She was given Demerol and Phenergan. (Tr. 279). On June 15, 2007, she was back with chronic back pain. (Tr. 284-285). On September 8, 2007, she presented to the emergency room with back pain after a long car ride from Tennessee with her husband. (Tr. 289). She was seen again on October 6, 2007, and October 15, 2007, for low back pain. (Tr. 295, 300). During the October 6, 2007, visit, the doctors noted that the Claimant moved all four extremities well. (Tr. 295). On October 24, 2007, a bone scan was normal. (Tr. 303). On November 13, 2007, the Claimant went to the emergency room again for back pain and medication refill. (Tr. 309).

The Claimant was also seen at the Center for Family Health, which is apparently affiliated with DeSoto Memorial Hospital during that same time period. (Tr. 225, 236, 246). On May 24, 2007, she was seen by Howard Pinsky, ARNP. (Tr. 245, 246). He explained to her that they did not do chronic pain management and he gave her the name of a pain management

doctor. He also prescribed Lorcet and Hyzaar. (Tr. 245). The Claimant told ARNP Pinsky on May 31, 2007, that the pain medication was not helping much. (Tr. 242).

On October 1, 2007, the Claimant told ARNP Pinsky that she was afraid she would have a stroke from the severe pain, until she could get to see a pain specialist on October 17, 2007. (Tr. 237). On October 18, 2007, ARNP Pinsky ordered a bone scan to rule out any occult fractures as the cause of the Claimant' pain. (Tr. 234). On November 7, 2007, he told her that the bone scan showed no evidence of trauma. (Tr. 232).

The Claimant was sent by ARNP Pinsky to a neurologist for testing in December of 2007. (Tr. 315). Lumbar MRI was normal, and nerve conduction study performed on January 21, 2008 was also normal. (Tr. 315, 317).

On March 28, 2008, the Claimant was seen at the Center for Family Health by Dr. Gordon Page. (Tr. 338). The Claimant showed him paperwork that her worker's compensation attorney had filed with the court attempting to get authorization for her to see a specialist. (Tr. 338). He again told the Claimant that he could not treat her chronic pain. He referred her to a pain management specialist. (Tr. 338).

On April 4, 2008, The Claimant went to Manatee County Rural Health Services for pain in her back and right side. (Tr. 360). They too told her that she needed to see a pain management doctor and she should work through her lawyer. They gave her Percocet and Soma and stated it was the last time they would fill the prescriptions. (Tr. 361).

On June 12, 2008, a Dr. Reiss referred the Claimant to Dr. Douglas Hershkowitz, a neurologist. (Tr. 397). He noted that she had a history of low back and bilateral leg pain. (Tr. 397). She said that the pain was increased by doing errands and helped by lying down and rotating her back. (Tr. 397). She was taking Soma, Percocet, and Lotrel for pain. (Tr. 397). On

7

examination, there was decreased range of motion in the back with tenderness and mild paravetrebral muscle spasm. Her gait was antalgic on right greater than the left. (Tr. 398). Dr. Hershkowitz stated that MRI of her lumbar spine showed a central herniation at L5-S1 with mild nerve root compression. (Tr. 398). The actual MRI was done on June 3, 2008, and indicated that at L5-S1 there was disc desiccation with a shallow central disc extrusion with mild caudal extension of disc material with diffuse disc bulging and facet arthropathy which contributed to mild left and mild to perhaps moderate right foraminal narrowing. (Tr. 401).

Dr. Hershkowitz at first stated that surgery was not an option because there was no evidence of radicular symptoms. He recommended physical therapy and injections (Tr. 398). The Claimant later called back and indicated that she did not want any further injections, and that the pain was going down both of her legs and was getting worse. (Tr. 396). On September 5, 2008, Dr. Hershkowitz stated that the Claimant's pain was getting worse; however, during the physical examination, compression and distraction did not cause the Claimant any pain. (Tr. 395). He diagnosed lumbar radiculopathy and lumbar spondylolisthesis. (Tr. 395). Percocet and Soma were renewed. (Tr. 395). He noted that she was planning on having surgery in October when she returned from Michigan with her husband. (Tr. 395).

On October 14, 2008, Dr. Hershkowitz noted that the Claimant's pain was quite severe and becoming intolerable. (Tr. 394). He diagnosed lumbar radiculopathy and discussed surgery with her. (Tr. 394) On October 24, 2008, Dr. Hershkowitz wrote a letter on the Claimant's behalf indicating that he had been treating her since June 12, 2008. (Tr. 393). She suffered from lumbar radiculopathy secondary to a large disc herniation in L5-S1 and she had not responded to conservative therapy. (Tr. 393). Her pain was increasing and intolerable and she had been offered a laminectomy and fusion for the pain. (Tr. 393). On February 5, 2009, Dr. Hershkowitz

noted that he recommended decompressive laminectomy and possible fusion for the Claimant. (Tr. 392).

On March 17, 2009, Dr. Hershkowitz noted that they were awaiting authorization for the laminectomy. The Claimant was continued on Oxycodone. (Tr. 390). On May 19, 2009, they were still awaiting surgical approval. (Tr. 389). On June 16, 2009, the Claimant had low back pain and right leg pain with numbness and tingling. She had an antalgic gait and walked with a cane. She was taking Oxycodone and Soma for the pain. She was diagnosed with lumbar radiculopathy and awaiting surgical approval. (Tr. 388). On October 15, 2009, Dr. Hershkowitz indicated that the Claimant was not ready to have the surgery yet. (Tr. 387). An MRI of the lumbar spine done on October 23, 2009, indicated shallow protrusion and disc bulging at the L5-S1 level with associated foraminal narrowing. (Tr. 400).

Records indicate that on May 20, 2008, a Dr. Reiss saw the Claimant for follow-up for continuing lower lumbar pain and radicular pain down her right lower extremity. (Tr. 403). Dr. Reiss indicated that an MRI of the right knee showed patella femoral arthritic change mostly along the trochlea and lateral patellar facet with mild arthritis in the medical and lateral joint space compartments. (Tr. 403). He indicated that the Claimant had right knee pain secondary to patella femoral DJD. She had not received any benefit from cortisone injection. This led him to believe that her pain could be radicular from the back. (Tr. 403).

On January 20, 2009, the Claimant again saw Dr. Keith Simon for an Independent Medical Examination. (Tr. 381-386). He noted that she was currently being treated by Dr. Hershkowitz, a nueorsurgeon. However, he was seeing her on a cash basis, and wanted $21,000.00 up front before he would perform back surgery. (Tr. 381). She was taking Oxycodone, Soma and Lotrel. (Tr. 382). Dr. Simon's examination revealed tenderness in the

lumbosacral junction and very prominent paravetrebral muscle spasm on the right lumbar area. (Tr. 382). The right knee had very marked crepitus in the patellofemoral joint. (Tr. 384). There was mild to moderate effusion and very tender in the retropatellar area and the medial and lateral joint lines. The left knee had patelloremoral crepitus, tenderness in the retropatellar area and mild effusion. (Tr. 383).

Dr. Simon reviewed notes from Dr. Reid, pain management specialist, who felt that the Claimant had chronic lower back pain, lumbar radiculopathy, facet joint disease L5-S1, myofascial syndrome and trigger points. (Tr. 384). A nerve conduction study showed a left S1 radiculopathy. (Tr. 384). Dr. Simon noted that there were also some findings that perhaps were consistent with sensory polyneuropathy if supported by appropriate clinical findings. (Tr. 384). Dr. Simon's conclusion was that the Claimant had a lumbar herniated disk with extrusion at L5-S1 with chronic back pain and radiculopathy. (Tr. 386). He also felt that she had right knee posttraumatic patellofemoral arthritis and to a lesser extent in the left knee. (Tr. 386). He stated that she was not at maximum medical improvement, and had not significantly improved since his last evaluation of her. (Tr. 386). She had limitations with standing, sitting, walking and lifting which were consistent with light duty work and lifting no more than 10-15 pounds. (Tr. 386). He stated no repetitive bending and lifting and she must vary sitting with standing and short distance walking. (Tr. 386).

*Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found the Claimant last met the insured status requirements of the Social Security Act on December 31, 2010. (Tr. 17). Furthermore, the ALJ found that the Claimant has not engaged in substantial gainful activity ("SGA") since her alleged onset date of October 25, 2007. (20 CFR 404.1571 *et seq.*). (Tr. 17). The ALJ concluded that

the Claimant had the following severe impairments: bulging disc in lumbar spine and right knee post traumatic patellofemoral arthritis. (20 CFR 404.1520(c)). (Tr. 17). However, through the date last insured, the Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (Tr. 18). After careful consideration of the entire record, the ALJ found that, through the date last insured, the Claimant had the residual functional capacity to lift and/or carry 10-15 pounds occasionally, stand and/or walk 2 hours total in an 8-hour workday, sit 6 hours total in an 8-hour workday, but never lift or bend repetitively. (Tr. 18).

In addition, the ALJ found that through the date last insured, the Claimant was unable to perform any past relevant work (20 CFR 404.1565). (Tr. 21). The Claimant was born on May 29, 1962, and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563). (Tr. 21). Furthermore, the Claimant has a limited education and is able to communicate in English (20 CFR 404.1564). (Tr. 21). The ALJ also found that the transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the Claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). (Tr. 22). Through the last date insured, considering the Claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the Claimant could have performed (20 CFR 404.1569, 404.1569(a)). (Tr. 22). Therefore, the Claimant was not under a disability, as defined in the Social Security Act, at any time from October 25, 2007, through the date of this decision (20 CFR 404.1520(g)). (Tr. 23).

## STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. Hibbard v. Commissioner, WL 4365647 *2 (M.D. Fla. December 12, 2007) (citing Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); McRoberts v. Bowen, 841 F. 2d 1077, 1080 (11th Cir. 1988)). In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations.[1] 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, WL 4365647 *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F. 3d 1232, 1240 n. 8 (11th Cir. 2004). The District Court must view

---

[1] The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:
    *Step 1*. Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.
    *Step 2*. Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.
    *Step 3*. Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.
    *Step 4*. Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.
    *Step 5*. Can he or she engage in other work of the sort found in the national economy? If so, then the claimant is not disabled. If the claimant cannot engage in other work, then he or she is disabled. See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The Court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [Commissioner]." Phillips, 357 F. 3d at 1240 n. 8; Dyer v. Barnhart, 357 F. 3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

Congress has empowered the District Court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g) (sentence four). The District Court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the District Court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).

## DISCUSSION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the Claimant unable to do his or her previous work, or any other substantial

gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505−404.1511.

The Claimant sets forth two main issues, which she indicates make remand of his case proper. First, the Claimant argues that the ALJ erred in failing to fulfill her duty to fully and fairly develop the record in this case. Second, the Claimant argues that the ALJ's credibility determination in this case was flawed. In response, the Commissioner argues that the ALJ fulfilled her duty to fully and fairly develop the record in this case and did not err in determining the Claimant's credibility because the ALJ's decision is supported by substantial evidence in the record. The Court will consider each of these issues in turn.

*Whether the ALJ Failed to Fulfill her Duty to Fully and Fairly Develop the Record in This case.*

The Claimant argues the ALJ failed to fulfill her duty to fully and fairly develop the record in this case. Specifically, the Claimant contends the record contains "numerous references to other physicians who had treated [the Claimant] for her conditions, and other medical reports[,] which would have been supportive of her allegations of disabling pain." (Doc. #20, P. 16). The Commissioner argues that the Claimant fails "to show why the ALJ was required to procure these records, when [the Claimant] could have readily produced them[,] and represented to the ALJ that the record was complete." (Doc. #21, P. 5).

The ALJ has a duty to fully and fairly develop the record. Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988); Cowart v. Schweiker, 662 F.2d 731, 735 - 36 (11th Cir. 1981). However, while it is well established that the ALJ has a duty to develop a full and fair record, that duty only extends to the record for the twelve (12) months preceding the filing of an application for benefits. Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).

Furthermore, the ALJ's duty to develop the record does not relieve the Claimant of his burden of proving that he is disabled, and consequently, the Claimant is still responsible for producing evidence in support of his claim. Id. (citing 20 C.F.R. ' 416.912(c)).

In this case, as pointed out by the Commissioner, the Claimant fails to show the Court why her claim was prejudiced because the ALJ did not obtain these records. For example, the Claimant argues that "Dr. Reid's records were very relevant to [the Claimant's] disability claim, and [because they are mentioned by Dr. Simon's records,] the ALJ should have procured those records as part of her duty." (Doc. #20, P. 15). However, the pertinent parts of Dr. Reid's records were summarized and made available for the record by Brandon Regional Hospital. *See* (Tr. 384). Therefore, because the pertinent parts of Dr. Reid's records were available for consideration in the medical record, and because the Claimant fails to indicate how not having Dr. Reid's full records was insufficient, the Claimant fails to demonstrate prejudice. *See* Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997) ("[Claimant failed to] show the kind of gaps in the evidence necessary to demonstrate prejudice.").

Moreover, the Claimant argues that the "ALJ failed in her duty to procure [Dr. Jason Reiss'] records in [the Claimant's] case." (Doc. #20, P. 15). However, similar to the analysis above, the medical record reviewed by the ALJ contains records from Dr. Reiss. *See* (Tr. 403). Specifically, Dr. Reiss' notes that are in the record give a history of the treatment of the Claimant, a review of a recent MRI ordered by Dr. Reiss, and a copy of the imaging report from the MRI. (Tr. 401; 403). Again, the Claimant fails to provide the Court with any basis of how the alleged lack of additional medical records demonstrates prejudice in any manner. In addition, during the hearing in front of the ALJ, the Claimant's Attorney contends that "additional evidence submitted November 30th . . . completes the record." (Tr. 32). Thus,

15

because the ALJ had substantial evidence in the record during the review, the Claimant has failed to show how she was prejudiced by an alleged lack of medical records, and the Claimant's Attorney admitted that the record was complete in the hearing in front of the ALJ. Therefore, the ALJ did not err in fulfilling her duty to fully and fairly develop the record in this case.

Furthermore, it is the Claimant's duty to provide sufficient evidence in the record to support the claim of disability. Specifically, 20 C.F.R. § 404.1512(a) clearly states that

> In general, you have to prove to us that you are blind or disabled. Therefore, **you must bring to our attention everything that shows that you are blind or disabled**. This means that **you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)** and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis. **We will consider only impairment(s) you say you have or about which we receive evidence**.

(Emphasis Added). Moreover, Courts in this District recognize that "[t]he plaintiff has the burden of providing the medical and other evidence about his or her impairments for the ALJ to use in making his conclusions." Harrison v. Astrue, 2009 WL 2044688 (M.D. Fla. July 10, 2009); See also Jones v. Astrue, 2008 WL 151877 (M.D. Fla. Jan. 15, 2008); Joyner v. Astrue, 2011 WL 4530678 (M.D. Fla. Sept. 29, 2011). Therefore, the Claimant bore the burden of providing any additional medical evidence not already contained in the record.

*Whether the ALJ's Credibility Determination in this Case was Flawed*

The Claimant argues that the ALJ erred in conducting the credibility determination in the instant case. Specifically, the Claimant states that the ALJ fails to specify what evidence does not support her allegations and that the ALJ failed in discussing the Claimant's credibility regarding contradictory statements. The Commissioner argues that "substantial evidence, sound reasoning, and detailed discussion of the pertinent evidence supports the ALJ's determination that [the Claimant's] allegations are not fully credible." (Doc. #21, P. 7).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Foote v. Chater, 67 F.3d 1553, 1561–62; Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. Hale v. Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. Foote, 67 F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

In this case, the Claimant first argues that the ALJ fails to specify what evidence does not support the Claimant's subjective complaints of pain. However, in the ALJ's Unfavorable Decision, the ALJ articulates specific objective medical evidence that goes against the Claimant's subjective complaints of pain. For example, the ALJ cites to a note from October 2009, which states that the Claimant's gait was within normal limits, her straight leg raising

caused no pain, and hip rotation caused no pain. (Tr. 20). Moreover, the ALJ also cites to an MRI from December 2007 that did not show any disc herniation or focal/neurological deficits. (Tr. 20). The ALJ references to a bone scan conducted in October 2007, which showed no evidence of bony trauma. (Tr. 20). Furthermore, the ALJ notes that Dr. Page informed the Claimant in March 2008 that her pain after her medication wears off was likely due to withdrawal from dependency on pain medication. (Tr. 20). Therefore, as evidenced by the cites to the ALJ's Unfavorable Decision, the ALJ "articulated specific and adequate reasons" for finding the objective medical evidence failed to support the Claimant's subjective complaints of pain.

Second, the Claimant argues that the ALJ erred by finding the Claimant's credibility undermined because of contradictory statements from the Claimant. However, a simple obversation of the record indicates that the ALJ found several inconsistencies with the Claimant's testimony. For example, the ALJ points out the fact that the Claimant "initially said that she does not have side effects from her medications, but then said that she falls asleep due to her medications." (Tr. 20, 39, 47). Moreover, the ALJ noted that the Claimant told several different doctors that she was seeing a pain specialist or was going to see a pain specialist, but failed to do so even after being instructed by multiple doctors to get her pain medication from a pain specialist. (Tr. 19). In fact, the Claimant "rated her pain as 0 out of 10 on a scale of 1 to 10 with '10' being the most severe pain." (Tr. 19). In addition, the ALJ asked the Claimant at the hearing whether or not the Claimant had "applied for or received workers' compensation since October 2007." (Tr. 35). The Claimant responded with "no, ma'am"; however, the record indicates that during Doctor's visits in 2008, the Claimant referenced a worker's compensation

case. (Tr. 35). For example, on February 28, 2008, Dr. Page noted that the Claimant had a current worker's compensation claim. (Tr. 339).

      Finally, the ALJ stated:

> [The Claimant] testified that she is able to dress herself slowly; she can cook; she washes dishes; she does the laundry with her daughter's help; and she can sweep and dust. The Claimant [also] stated [that] she does buy small items at the store, but she does not go grocery shopping. She said that she vistis her mother once every 2 months and she attends her daughter's school activities. The Claimant asserted that she likes to read and watch television. On a typical day, she described that she wakes up at 4:00 a.m.; gets dressed; smokes a cigarette; takes her medications; fixes her daughter's and husband's lunches; wakes up her daughter; fixes her daughter's breakfast; does her daughter's hair; and takes her daughter to school. The Claimant indicated that after she returns from taking her daughter to school, she washes the dishes; makes the bed; feeds her pets; and then she takes a nap. She stated that she then picks her daughter up from school; she makes dinner; she irons; and then she feeds her husband. The Claimant said that she could not perform an office job because she cannot sit for a long time and falls asleep from her medication. She testified that she always has pain.

(Tr. 19). While the performance of everyday tasks cannot be used to make a determination that the Plaintiff was not disabled, daily activities can be used as a measure of the Plaintiff's credibility in regard to his ability to perform certain tasks. *See* Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (noting that the ALJ properly discredited a treating physicians testimony by pointing out the contrasts in the claimants daily activities and the physicians diagnosis); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because of her daily activities demonstrated otherwise). *See* Norris v. Heckler, 760 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making a credibility determination). Therefore, as seen by reference to the record above, the ALJ, again, "articulated specific and adequate reasons" for finding that the Claimant's contradictions in testimony do not support the Claimant's subjective complaints of pain.

19

Accordingly, it is now

**ORDERED:**

Plaintiff, Gloria G. Hernandez' Complaint seeking review of the final decision of the Commissioner denying Plaintiff's claim for disability insurance (Doc. #1) is **DENIED**.

The Clerk of the Court is hereby directed to issue a **JUDGMENT** consistent with this ruling and to thereafter close the file.

**DONE** and **ORDERED** in Fort Myers, Florida this 24th day of July, 2012.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  All Parties of Record